CANTEEN CORPORATION, Petitioner, Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.

Nos. 95–2736, 95–2952.

United States Court of Appeals, Seventh Circuit.

Argued March 25, 1996.

Decided Jan. 7, 1997.

Steven H. Adelman (argued), John M. Phelan, Lord, Bissell & Brook, Chicago, IL, for Petitioner, Cross–Respondent in both cases.

Elizabeth Kinney, National Labor Relations Board, Region 13, Chicago, IL, Aileen A. Armstrong, Linda J. Dreeben, David Habenstreit (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, for Respondent, Cross–Petitioner in No. 95–2736.

Elizabeth Kinney, National Labor Relations Board, Region 13, Chicago, IL, Aileen A. Armstrong, Linda J. Dreeben, David Habenstreit (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, Philip E. Bloedorn, National Labor Relations Board, Region 30, Milwaukee, WI, for Respondent, Cross–Petitioner in No. 95–2952.

Before BAUER, RIPPLE and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.

The issues in this appeal focus upon the status of Canteen Corporation ("Canteen") as a successor employer to Service America at the Medical College of Wisconsin. The Administrative Law Judge ("ALJ") concluded that Canteen was a successor; the National Labor Relations Board ("NLRB" or "the

Board") agreed.[1] On the basis of the ALJ's successorship analysis, adopted by the Board, Canteen was found to have violated sections 8(a)(1), (3) and (5) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. §§ 158(a)(1), (3) and (5).[2] Challenging its designation as a successor, Canteen now petitions this court to review the final order of the Board. The Board has filed a cross-petition seeking enforcement of its order. For the reasons set forth in the following opinion, we deny the petition for review and enforce the Board's order.

## I

### BACKGROUND

A. *Facts*

Prior to July 1992, the food service contract at the Medical College of Wisconsin was held by Service America. Service America's four nonsupervisory employees at the Medical College were represented by the Hotel Employees and Restaurant Employees Union Local No. 122, AFL–CIO ("the Union"). In late May 1992, Canteen, a competitor food service contractor, successfully bid on the food service operations for the Medical College. Under the terms of the takeover, it would replace Service America in that service on July 1, 1992.

Canteen first initiated contact with the Union before it bid on the Medical College's food service operations. It requested and received from the Union a copy of its collective bargaining agreement. After Canteen won the bid, Robert Kovacs, Canteen's director of labor relations, and Dennis Hillgart-

ner, its district manager for food services, decided that there needed to be a new position at the Medical College, that of "working manager." On June 8, Kovacs telephoned Vince Gallo, the Union's business manager. He told Gallo that Canteen was "interested in working out an arrangement wherein we could have language concerning a working manager," Tr. at 27, and offered to send Gallo something in writing from other labor contracts that had authorized a supervisor to perform bargaining unit work. Gallo responded that he wanted to use the Service America contract as a guide to the overall negotiations; Kovacs in turn said that he preferred to use the contract between the Union and Miller Brewing Company. After this conversation with Kovacs, Gallo assured the Service America employees that they would be working under a union contract after the takeover.

On June 11, Hillgartner delivered to Gallo's office the written contract language concerning a "working manager." On that same day, Matthew Fitzgerald, the food service manager, posted a notice in the Medical College cafeteria announcing that Canteen was accepting applications. At about the same time, the four Service America employees were solicited personally by Canteen officials. On June 15, Kovacs sent Gallo a letter notifying him of Canteen's July 1 opening at the Medical College of Milwaukee and stating:

> It is imperative to our successful operation of this facility that it be staffed by a working manager. To that end, I would propose that we either add language to any collective bargaining agreement or

1. The NLRB affirmed the ALJ's rulings, findings (after correcting two minor errors) and conclusions based on the ALJ's successorship analysis. It adopted the ALJ's recommended order as well, with a modification that does not affect this appeal. The Board issued a cease and desist order and required that Canteen (1) rescind the unilateral changes it made prior to negotiating with the Union and (2) offer reinstatement and restitution to the three constructively discharged employees of the predecessor employer.

2. Section 8(a) of the NLRA provides, in pertinent part:
 (a) It shall be an unfair labor practice for an employer

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [29 U.S.C. § 157, which grants employees the right to form and to join labor unions];
. . .
(3) by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization . . .; [or]
. . .
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
29 U.S.C. §§ 158(a)(1), (3), (5).

sign a letter of understanding that clearly spells out this position.

Therefore, I would propose the following language that is contained in other ... contracts:

*Bargaining Unit Work*

[It is] agreed that supervisory employees shall be allowed to perform work normally done by bargaining unit employees as long as they do not displace said employees.

If you agree, please sign one copy of the two enclosed originals and return same to my office.

A.R.II, Ex. GC–4. The Union did not sign a copy. Around June 22, therefore, Kovacs initiated another conversation with Gallo. Kovacs testified that "we were within a couple of weeks of opening the account and we wanted to make sure that we were in agreement on it." Tr. at 32. Gallo ultimately agreed to the language proposed in Kovacs' letter. In their discussion, Kovacs also stated that he wanted the employees to serve a probationary period; Gallo replied that he did not object. Gallo testified that, during this conversation, he and Kovacs planned to meet in order to exchange proposals and to negotiate an agreement for the Medical College on June 30, the same day they were interviewing Canteen's employees at Miller Brewing.

The job interviews were held during the week of June 23. Steve Srok, Canteen's on-site manager, interviewed each of the three who applied (Kelly Piquette, Susan Anderson and Irene Cook).[3] He offered each one a job at a salary rate of $5.70 an hour. Srok testified that he became aware, during the interviews, of the drastic reductions in earnings they would sustain if they accepted employment with Canteen: The three were making $6.79 or $7.49 as Service America employees. Even though the rate was raised to $5.72 an hour, eventually each one refused to accept employment because of the low wage offer. As a result, Canteen was forced to hire quickly from other sources.

Once Service America's employees rejected the job offers, Canteen's corporate vice president in charge of labor relations "instructed Kovacs to refuse to negotiate" with the Union because it no longer represented employees working at the Medical College. Tr. at 38, 48–49. On June 30, Kovacs and Hillgartner met with Vince Gallo; once they completed their discussion on the Miller Brewing contract, however, Kovacs refused to talk to Gallo about the Medical College contract. Kovacs admittedly told Gallo: "I have been advised by my boss that I will not recognize Local 122 since we feel that they legally do not represent the employees at the Medical College." Tr. at 38. Gallo, who did not know that the Service America employees had turned down the job offers, left in anger. When he telephoned the Service America employees, they told him they had "no choice" but to reject the offers because of the substantial cuts in pay. At Gallo's recommendation the employees wrote a letter stating that they would work for Canteen at the Medical College if current conditions were met. Gallo then returned to the meeting and declared to Kovacs that Canteen had "stabbed me in the back, that we had an agreement that we were going to negotiate a contract, and they orchestrated the discharge of those employees by offering reduced wages and no benefits." Tr. at 162. Canteen representatives left the meeting. The company did not respond to the letter signed by the Service America employees.

The Union then filed this unfair labor practice charge on July 21, 1992. The complaint alleges that Canteen violated sections 8(a)(1), (3) and (5) of the NLRA by (a) bargaining with, and then withdrawing recognition from, the Union as the exclusive bargaining representative of a unit of employees in its newly acquired business, and (b) constructively denying employment to the employees of Service America by offering predictably unacceptable terms, thereby causing them to reject job offers.

---

**3.** The fourth Service America worker, Sandra Wilson, never applied or interviewed for the job, despite the fact that a Canteen manager twice expressed interest in her continuing, because she could not afford to work for Canteen at the reduced wage offers described by her co-workers.

## B. Decision of the Administrative Law Judge

The ALJ found, from the evidence and testimony presented by Canteen officials, that as of June 22, Canteen "held the intention, albeit unannounced, to retain the Service America employees at the Medical College." *Canteen Corp.*, 317 NLRB 1052, 1063, 1995 WL 407199 (1995). The ALJ noted Canteen's several contacts with the Union, its invitation posted in the Medical College cafeteria to submit applications, and its managers' personal solicitation of the four Service America workers to apply and to schedule an interview. He then found that Canteen "was on a course pointing to recognition of the Union and retention of the Service America employees." *Id.* at 1064.

The ALJ concluded that Canteen was a "successor" to Service America at the Medical College under the successorship doctrine of federal labor law. The ALJ found that there was a substantial continuity in the operations of Canteen and Service America; Canteen continued to provide the same services and to serve the identical market under the same conditions with no break in time for provision of those services. *Id.* at 1065–66. The ALJ acknowledged that Canteen did not employ a single Service America employee, and therefore did not establish the second "successorship prong"—that a majority of the new employer's employees were the predecessor's employees. Nevertheless, the ALJ determined that Canteen's failure to retain a majority of Service America's employees was based on illegal discrimination: Canteen's low wage offers were "predictably unacceptable" and were made when it was required to consult the Union. *Id.* at 1066.

The ALJ found that it was "perfectly clear" that the new employer planned to hire all of the Service America employees and therefore that Canteen was required to accept the collective bargaining relationship of the predecessor employer and to consult with the Union before it fixed its terms. The ALJ stated that Canteen, by its "overall pattern of conduct[,] left the Union every reason to assume that, until alternative terms were established through negotiations, then scheduled for June 30, [Canteen] would maintain all employment conditions" for those four employees. *Id.* at 1067. Thus, the ALJ concluded that Canteen violated subsections 8(a)(5) and (1) by stating unilaterally, at the job interviews, that the job offers were contingent on acceptance of the low hourly wage. It also violated those sections by refusing to recognize and to bargain with the Union. Canteen violated sections 8(a)(3) and (1), as well, concluded the ALJ, by constructively denying employment to the Service America employees through the imposition of an unacceptable condition of employment that understandably was rejected by the employees. *Id.* at 1068.

## C. Decision of the NLRB

The Board, agreeing with the ALJ, found that Canteen had violated section 8(a)(5) when, on or after June 23, it told the predecessor employees that they could continue working but at significantly reduced wages. The Board based its findings of violation on the fact that Canteen had announced its new wage rates after it had made clear its intent to retain the predecessor employees. The Board also agreed with the ALJ that Canteen had violated sections 8(a)(3) and (1) by constructively denying employment to the predecessor employees. In the principal opinion, the members stressed that, prior to that date, Canteen had contacted the predecessor employees and told them that it wanted them to apply for employment with Canteen. Additionally, during that same period, Canteen had discussed with the Union its desire to establish a working manager position and had discussed further, on June 22, its desire that all employees serve a probationary period. The opinion also noted that Canteen and the Union also had discussed the sample contract that they would use in their negotiations and had agreed to negotiate a collective bargaining agreement before the onset of Canteen's operation. Throughout all of these contacts with Service America employees and the Union, noted the opinion, Canteen never mentioned that it contemplated changes in the employee's salary level. The members found that, "as it was 'perfectly clear' on June 22 that [Canteen] planned to retain the predecessor employees, [Can-

teen] was not entitled to unilaterally implement new wage rates thereafter." *Canteen Corp.,* 317 NLRB 1052, 1053, 1995 WL 407199 (1995). The Board explicitly rejected the view that the obligation to bargain only arose when the employer had failed to announce the initial employment terms prior to, or simultaneously with, the extension of unconditional job offers to the predecessor employees. Such a view, remarked the Board, would be inconsistent with the "perfectly clear" caveat of the Supreme Court of the United States in *NLRB v. Burns International Security Services,* 406 U.S. 272, 294–95, 92 S.Ct. 1571, 1586, 32 L.Ed.2d 61 (1972). It would create, continued the Board, the very real possibility that a new employer could mislead the existing employees into believing that they would be continued in their present employment without a change in the terms or conditions of that employment.

Chairman Gould concurred with the majority. He disagreed with his colleagues in the majority that *Burns* in any way required the Board to focus on whether the employees were misled into believing that they would be retained without changes in their working conditions. In his view, the only issue in determining whether the new employer has the duty to bargain is whether that employer intends to hire its initial workforce from the employees of the predecessor owner. He summarized his position succinctly:

> Thus, in the present case, the dispositive fact establishing the Respondent's status as a "perfectly clear" successor is undisputed: [T]he Respondent intended to attempt to hire its initial work force from the employees currently working at the predecessor's facility. The respondent was therefore obligated to bargain with the Union before it "fix[ed] terms" ... and violated Section 8(a)(5) by unilaterally making changes in existing terms and conditions of employment prior to commencing operations on July 1, 1992.

*Canteen,* 317 NLRB at 1055.

Two members of the Board dissented. In their view the ALJ mistakenly focused on whether the employees were misled into believing they would be retained without changes in their working conditions. According to the dissenters:

> [A] new employer need only consult with the predecessor employees' bargaining representative prior to setting initial terms and conditions if (a) the new employer plans to retain a sufficient number of predecessor employees to make it evident that the bargaining representative's majority status will continue and (b) the new employer fails to announce to the predecessor employees, prior to, or simultaneously with, extending an unconditional offer to hire, that its initial terms will be different from the predecessor's terms.

*Id.* at 1058–59.

The dissent took the view that Canteen would have the responsibilities of a successor employer elucidated in *Burns* only if it had made a firm offer to the employers of its predecessor. In its view of the record, Canteen merely had decided to interview all the predecessor's employees, not to hire them. It concluded that Canteen was thus free to set initial terms and conditions of employment. For the dissenters, Canteen was not a successor and was not obligated to recognize the Union because Canteen lawfully failed to employ a majority of the Service America employees after it had indicated a change in salary simultaneously with its offer to employ the Service America employees.

## II

### DISCUSSION

#### A. *Standard of Review*

■ The standard by which we review an NLRB decision is set forth in the Act: We are to determine whether there is "substantial evidence in the record as a whole" to support the Board's factual findings and its application of the law to the facts. 29 U.S.C. § 160(e); *Rock–Tenn Co. v. NLRB,* 69 F.3d 803, 807 (7th Cir.1995); *U.S. Marine Corp. v. NLRB,* 944 F.2d 1305, 1313–14 (7th Cir.1991) (en banc), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992). As we canvas the record, however, we are not to "displace the Board's choice between two fairly conflicting views." *Universal Camera*

*Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). In fact, because we recognize that "Congress has decided to vest primary responsibility for the implementation of [NLRA] policy in the NLRB and not in this court," our role requires considerable restraint. *U.S. Marine Corp.,* 944 F.2d at 1314. The Act's objective "is industrial peace and stability, fostered by collective-bargaining agreements providing for the orderly resolution of labor disputes between workers and [employers]." *Auciello Iron Works, Inc. v. NLRB,* —— U.S. ——, ——, 116 S.Ct. 1754, 1758, 135 L.Ed.2d 64 (1996). We therefore give deference to the Board's rulings interpreting the Act as long as they are rational and consistent with the Act. *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 42, 107 S.Ct. 2225, 2235, 96 L.Ed.2d 22 (1987).

### B. *Successorship Principles of Federal Labor Law*

This case presents a problem that occurs with some frequency: the determination of whether a new employer, upon acquiring the business of another employer, incurs the obligation to consult with the union that represented the employees of that predecessor employer.

#### 1.

■ It is a fundamental principle of federal labor law that a new employer is generally free to decide upon the initial terms and conditions of employment for its employees. *NLRB v. Burns Int'l Sec. Servs., Inc.,* 406 U.S. 272, 287–88, 294, 92 S.Ct. 1571, 1582, 32 L.Ed.2d 61 (1972); *United States Can Co. v. NLRB,* 984 F.2d 864, 869 (7th Cir.1993). However, a new employer must recognize and bargain with the union representing the predecessor's employees if the new employer is a "successor employer" to the predecessor. There are threshold requirements to becoming such a "successor employer." When substantial continuity of operations and of workforce are found, the duty to bargain with the union is triggered. *See Fall River,* 482 U.S. at 41, 107 S.Ct. at 2234 ("If the new employer makes a conscious decision to maintain generally the same business and to hire a major-

ity of its employees from the predecessor, then the bargaining obligation of § 8(a)(5) is activated."); *United States Can,* 984 F.2d at 869 ("An employer that hires a majority of the old labor force must bargain with any union that represents the workers."). Under the first of these two criteria, there must be "substantial continuity" between the enterprises of the successor's and the predecessor's business. *Fall River,* 482 U.S. at 43, 107 S.Ct. at 2236; *Burns,* 406 U.S. at 280–81, 92 S.Ct. at 1578–79; *U.S. Marine Corp.,* 944 F.2d at 1315. This continuity is measured by whether the new employer "has acquired substantial assets of the predecessor and continued, without interruption or substantial change, the predecessor's business operations." *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 184, 94 S.Ct. 414, 425, 38 L.Ed.2d 388 (1973). There is no dispute between the parties in this case that Canteen qualifies as a successor to Service America in this regard; it is continuing to provide food services to the same customers at the Medical College, without a hiatus in service, in the same capacity and without significant change.

■ The second factor requires that a sufficient number—a majority or more—of the new employer's workforce be comprised of the predecessor's employees. *Fall River,* 482 U.S. at 46, 107 S.Ct. at 2237; *Burns,* 406 U.S. at 278–79, 92 S.Ct. at 1577–78; *U.S. Marine Corp.,* 944 F.2d at 1315. A successor, therefore, is a new employer that continues essentially the same business operations using a majority of the old employer's workers. This requirement for a successor employer contains a special corollary principle first enunciated in *Burns* and often referred to as the "perfectly clear" exception:

> ■ Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms.

*Burns,* 406 U.S. at 294–95, 92 S.Ct. at 1585–86. The Court thus established that a suc-

cessor would be required to bargain with the union before setting its initial terms of hiring when it was clear that it intended to hire a majority of the predecessor's workforce.

In the aftermath of *Burns,* the Board and the courts of appeals have interpreted the scope and meaning of the "perfectly clear" exception. The Board's interpretation of the *Burns* exception in *Spruce Up Corp.,* 209 NLRB 194, 1974 WL 4741 (1974), *enforced without opinion,* 529 F.2d 516 (4th Cir.1975), significantly limited the applicability of the "perfectly clear" caveat to specific conduct by the new employer:

> We believe the caveat in *Burns,* therefore, should be restricted to circumstances in which the new employer has either actively, or by tacit inference, misled employees into believing they would all be retained without change in their wages, hours, or conditions of employment, or at least to circumstances where the new employer . . . has failed to clearly announce its intent to establish a new set of conditions prior to inviting former employees to accept employment.

*Spruce Up,* 209 NLRB at 195.

In the case before us, a divided Board debated within the opinions of its various members the validity of the precise formulation described in *Spruce Up* as a basis for invoking the "perfectly clear" exception. As Chairman Gould pointed out in his separate concurring opinion, it appears that a majority of the Board—the dissenting members and Chairman Gould—was unwilling to endorse this formulation as faithful to the mandate of *Burns.* The majority did not believe that *Burns* really required that the Board undertake an inquiry into whether the workers were misled by the misrepresentation of the new employer with respect to the terms of employment.

■ Whatever the merits of the various justifications offered for the shift in position with respect to *Spruce Up,* the matter is not directly relevant to our disposition of this case. Although placing a significant and perhaps fatal cloud over the continued viability of the specific *Spruce Up* criterion, a majority of the Board—the plurality and Chairman Gould—made clear that the basic *Burns*

mandate must still be observed: A new employer must consult with the union when it is clear that the employer intends to hire the employees of its predecessor as the initial workforce. As we shall discuss in the following paragraphs, we believe that the Board was on solid ground in concluding that, under *Burns,* Canteen had an obligation to consult with the Union that represented the workers that it had decided to hire.

### C. *The Challenged Unfair Labor Practices*

#### 1.

We turn first to the Board's determination that Canteen, as a successor employer, violated sections 8(a)(5) and (1) of the NLRA by unilaterally fixing initial terms of employment and by refusing to bargain with the Union after Canteen had made it perfectly clear that it intended to hire a majority of its employees from its predecessor's workforce.

#### (a)

■ The Board majority, the plurality and the concurring member, determined that Canteen intended to hire the employees of the predecessor employer, Service America, and that, consequently, it was "perfectly clear" that the employer intended to retain all the former employees. Canteen first submits that the record cannot support that determination. According to Canteen, it was not perfectly clear that it planned to retain a majority of Service America's employees. Canteen claims that it never announced an intention to employ the predecessor's employees; nor did it state that they would be hired under the predecessor's terms and conditions. Rather, Canteen states, it "showed a consistent and unwavering intent to hire only those Service America employees who applied *and* who would accept the terms and conditions of employment being set by Canteen for its new employees." Pet'r Br. at 29.

We believe that the record supports, abundantly, the determination of the Board. The issue of Canteen's intent was the prime focus of the ALJ's assessment. The ALJ carefully delineated the events that occurred as Canteen prepared to assume operation of the food service at the Medical College of

Wisconsin. He reviewed the documentary evidence, reported the testimony of the witnesses at the hearing, and resolved credibility questions when the testimony was in conflict. He then concluded that Canteen fully planned to rehire Service America's employees:

> [A]ccording to a consistent segment of [Canteen's] evidence, [Canteen] held the intention, albeit unannounced, to retain the Service America employees at the Medical College. It also asserted on behalf of [Canteen] that it was expected that they would accept its offers of employment.

*Canteen Corp.,* 317 NLRB at 1063. The Board agreed with the ALJ. It found "that by June 22, when [Canteen] expressed to the Union its desire to have the predecessor employees serve a probationary period, [Canteen] had effectively and clearly communicated to the Union its plan to retain the predecessor employees." *Id.* at 1053.

The ALJ's finding, based on his observations of the witnesses' demeanor and his expressed or implied credibility determinations concerning their testimony, is entitled to considerable deference and may be overturned on review only in extraordinary circumstances.[4] Our review of the record leaves us with no doubt that the ALJ's finding, affirmed by the NLRB, is supported by substantial evidence. The totality of Canteen's conduct demonstrated that it was "perfectly clear" that Canteen planned to retain the predecessor employees. These occurrences prior to Canteen's July 1, 1992 takeover of operations at the Medical College substantiate such a conclusion:

(1) Canteen personally contacted the predecessor employees to encourage them to apply for employment with Canteen.

(2) Canteen took no action to hire outside applicants until after the predecessor employees turned down the jobs.

(3) In June, Canteen initiated several discussions with the Union concerning its desire (a) to establish a "working manager" position, (b) to pick the contract to be used as a model when negotiating a new collec-

tive bargaining agreement, and (c) to set a time, date and place for future discussions.

(4) On June 22, Canteen informed the Union that it wanted its predecessor employees to serve a probationary period with Canteen; the Union agreed to this request.

(5) On June 22, Canteen and the Union agreed to meet on June 30 to negotiate a collective bargaining agreement.

*See Canteen,* 317 NLRB at 1052. Of particular relevance to the ALJ was the fact that Canteen's "intention to retain the Service America employees was backed by an expectation so strong that it neglected to take serious steps to recruit from other sources until it was informed that they had rejected job offers." *Id.* at 1063. Similarly, it was critical to the Board that Canteen "intended from the outset to hire all of the predecessor employees" and "did not mention in these discussions the possibility of any other changes in its initial terms and conditions of employment." *Id.* at 1053 n. 5. The concurring member agreed with the NLRB majority that Canteen intended to hire the predecessor's employees and thus was obligated under *Burns,* 406 U.S. at 295, 92 S.Ct. at 1586, to bargain with the Union before it fixed terms. *Canteen,* 317 NLRB at 1054. As the ALJ put it, Canteen, at "all times, to the point of dependency, ... held to an unflagging plan and desire to" hire the Service America employees. *Id.* at 1067.

Because the evidence fully supports the finding that Canteen planned to retain the Service America employees, we have no basis for disturbing the Board's finding.

(b)

Canteen also asserts that, even assuming that the record supports the Board's determination that Canteen intended from the outset to hire the entire workforce of the predecessor employer, such a determination is without legal significance because the Board misinterpreted the "perfectly clear" exception. Canteen urges us to follow the Second

---

4. *Carry Cos. v. NLRB,* 30 F.3d 922, 926 (7th Cir.1994); *Missouri Portland Cement Co. v. NLRB,* 965 F.2d 217, 219 (7th Cir.1992); *NLRB v. Stor–Rite Metal Prods., Inc.,* 856 F.2d 957, 964 (7th Cir.1988).

Circuit's ruling in *Nazareth Regional High School v. NLRB*, 549 F.2d 873 (2d Cir.1977). More specifically, it asks us to:

> read [*Spruce Up* ] as limited to those situations where employees are led at the outset by .the successor-employer to believe that they will have continuity of employment on pre-existing terms and as not applying where the new employer dispels any such impression prior to or simultaneously with its offer to employ the predecessor's work force.

*Id.* at 881 (quoting *Brotherhood of Ry. Clerks v. REA Express, Inc.*, 523 F.2d 164 (2d Cir.), *cert. denied*, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975)). On the basis of *Nazareth*, Canteen claims that any misconception about its intent with respect to the predecessor's employees was clarified when, at the job interviews, it offered terms and conditions different from those of its predecessor.

We have noted earlier the deferential nature of our review of the Board's interpretation of the statute that it is charged with administering. *See Fall River.*[5] We must recognize that, in applying "the general provisions of the Act to the complexities of industrial life," *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 .(1963) (citations omitted), the Board brings to its task an expertise that deserves our deference.

It is clear that a majority of the Board, although questioning whether *Spruce Up* was correct in extending the "perfectly clear" exception to situations in which the employees are misled into believing that they will be hired by the new employer, adheres to that part of the *Spruce Up* holding that applies the "perfectly clear" exception when the employer intended from the outset to hire the employees of the predecessor employer. Canteen gives us no new reason to question the Board's long-standing position. Indeed, as the Board plurality wrote, to accept such a position would require that we reject the very language of the "perfectly clear" formu-

lation of the Supreme Court in *Burns*. Indeed, in the past, we expressed some concern with the Second Circuit's reformulation of the Board's *Spruce Up* doctrine. *See U.S. Marine Corp.*, 944 F.2d at 1321 n. 22. Similar reservations have been expressed by the Sixth Circuit. *See Spitzer Akron, Inc. v. NLRB*, 540 F.2d 841, 846 (6th Cir.1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977). The Court of Appeals for the District of Columbia Circuit correctly grasped the wisdom of the Board's position when it stressed that, when it is clear that the new employer intends to hire the employees of the predecessor, those employees will place significant reliance on that situation and forego other employment opportunities.

> That is significant because unconditional retention-announcements engender expectations, ofttimes critical to employees, that prevailing employment arrangements will remain essentially unaltered. Even when incumbents are not affirmatively led to believe that existing terms will be continued, unless they are apprised promptly of impending reductions in wages or benefits, they may well forego the reshaping of personal affairs that necessarily would have occurred but for anticipation that successor conditions will be comparable to those in force.

*International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. NLRB*, 595 F.2d 664, 674–75 (D.C.Cir.1978), *cert. denied*, 439 U.S. 1070, 99 S.Ct. 839, 59 L.Ed.2d 36 (1979).

The approach of the Board is compatible with the practical reality expressed by the Supreme Court in *Fall River*, 482 U.S. at 40–41, 107 S.Ct. at 2234: "[T]o a substantial extent, the applicability of *Burns* rests in the hands of the successor." It may explore all options with respect to the composition of its workforce. However, when it determines that it will retain the workforce of its predecessor, it cannot ignore the Union those em-

---

5. In *Fall River*, the Supreme Court stated:
 The Board, of course, is given considerable authority to interpret the provisions of the NLRA. If the Board adopts a rule that is rational and consistent with the Act, ... then the rule is entitled to deference from the

courts. Moreover, if the Board's application of such a rational rule is supported by substantial evidence on the record, courts should enforce the Board's order.
*Fall River*, 482 U.S. at 42, 107 S.Ct. at 2235.

ployees have chosen when it comes time to determine the conditions of employment.

### 2.

The Board also agreed with the ALJ that Canteen had violated sections 8(a)(3) and (1) of the NLRA "by constructively denying employment to the predecessor employees (i.e., making them choose between employment on its unlawfully unilateral terms and declining the employment offer)." *Canteen*, 317 NLRB at 1054. The ALJ found that Canteen had constructively denied employment to Service America's employees by unilaterally setting and imposing a "predictably unacceptable" condition of employment, the low salary offer. *Id.* at 1066. As the ALJ explained,

> [T]he 8(a)(3) allegations are controlled by the principle that "employees who quit rather than work under conditions established in derogation of the statutory right to bargain ... [are] ... constructively discharged in violation of Section 8(a)(3) and (1) of the Act." Accordingly, on this basis, it is concluded that [Canteen] violated Section 8(a)(3) and (1) of the Act by denying employment, on a constructive basis to Piquette, Anderson, and Cook.

*Id.* at 1068.

 Canteen submits that there can be no violation of section 8(a)(3) without proof that the employer's conduct was motivated at least in part by discriminatory intent, specifically antiunion animus, and, in this case, the ALJ found that there was no discrimination. It is true that, although the ALJ found that the wages offered were "predictably unacceptable," he did not believe that the low wage was "part of a deceptive, deliberate scheme to avoid collective bargaining." *Id.* at 1068 n. 39. In his view, Canteen was confident that the Service America employees would accept employment at the lower wage. In the end, he based his decision on the fact that specific evidence of an antiunion intent was not required to substantiate an 8(a)(3) violation. *Id.*

 It is an unfair labor practice, under section 8(a)(3) of the NLRA, for an employer "by discrimination in regard to ... any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). As a general proposition, an employer violates this provision "when it purposefully creates working conditions so intolerable that the employee has no option but to resign—a so-called 'constructive discharge.'" *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 894, 104 S.Ct. 2803, 2810, 81 L.Ed.2d 732 (1984). The employer also "must have acted with the intent to discourage union membership or activity." *NLRB v. Bestway Trucking, Inc.*, 22 F.3d 177, 181 (7th Cir.1994). However, although the finding of a section 8(a)(3) violation usually depends on proof of intent or antiunion motivation, no such proof is necessary "if it can reasonably be concluded that the employer's discriminatory conduct was 'inherently destructive' of important employee rights." *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967). As the Court explained that phrase:

> [S]ome conduct carries with it "unavoidable consequences which the employer not only foresaw but which he must have intended" and thus bears "its own indicia of intent." If the conduct in question falls within this "inherently destructive" category, the employer has the burden of explaining away, justifying or characterizing "his actions as something different than they appear on their face," and if he fails, "an unfair labor practice charge is made out."

*Id.* at 33, 87 S.Ct. at 1797 (citations omitted). Thus the section 8(a)(3) violation depended on proof that Canteen's conduct was "inherently destructive of important employee rights" or that Canteen acted with the intent to discourage union membership.

The Board, with the approval of appellate courts, has held that an employer who unlawfully conditions employment on conditions established in derogation of the employees' statutory right to union representation creates an "intolerable working condition." Furthermore, an employee who resigns when continued employment is so conditioned has been constructively discharged in violation of sections 8(a)(3) and (1) of the Act. *See*

**1366**

NLRB v. Haberman Constr. Co., 641 F.2d 351, 358 (5th Cir.1981) (en banc); *RCR Sportswear, Inc.,* 312 NLRB 513, 513 (1993), *enforced without opinion,* 37 F.3d 1488 (3d Cir.1994); *Control Services, Inc.,* 303 NLRB 481, 484–85 (1991), *enforced without opinion,* 975 F.2d 1551 (3d Cir.1992).

In this case, Canteen instituted unilateral changes in the initial terms of employment by offering drastically reduced rates of pay to the predecessor's experienced employees without prior negotiation. The employees' refusal to accept employment was found by the ALJ and the Board to be a constructive denial of employment. We agree that Canteen's conduct was "inherently destructive" of the rights of those employees. As a result, Canteen had the burden of justifying its actions.

> [O]nce it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him.

*Great Dane,* 388 U.S. at 34, 87 S.Ct. at 1798. Canteen has failed to satisfy this burden. It has failed to characterize its conduct in lawful terms. As a result, we enforce the Board's order with respect to its ruling that Canteen violated sections 8(a)(3) and (1) of the Act by constructively denying employment to the predecessor's employees.

### Conclusion

For the foregoing reasons, we deny Canteen's petition for review and grant enforcement of the Board's order.

ENFORCEMENT GRANTED; REVIEW DENIED.