RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0233P (6th Cir.)
File Name: 02a0233p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DUPONT DOW ELASTOMERS,
L.L.C.,
*Petitioner/Cross-Respondent,*

*v.*

NATIONAL LABOR
RELATIONS BOARD,
*Respondent/Cross-Petitioner,*

CHEMICAL WORKERS
ASSOCIATION INC.,
         *Intervenor.*

Nos. 00-2379;
01-1009

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board.
Nos. 9-CA-34028/33536.

Argued: April 30, 2002

Decided and Filed: July 15, 2002

1

Before:  SUHRHEINRICH and GILMAN, Circuit Judges;
              HOOD, District Judge.[*]

---

**COUNSEL**

---

**ARGUED:**  Barry M. Willoughby, YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware, for Petitioner.  Jill Griffin, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.  **ON BRIEF:** Barry M. Willoughby, William W. Bowser, Scott A. Holt, YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware, for Petitioner.  Jill Griffin, Aileen A. Armstrong, Charles P. Donnelly, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

---

**OPINION**

---

SUHRHEINRICH, Circuit Judge.    Petitioner/Cross-Respondent Dupont Dow Elastomers, L.L.C. ("DDE" or "Company") appeals from the order of the National Labor Relations Board ("NLRB") in Case Nos. 9-CA-34028 and 9-CA-33536 finding that DDE violated Section 8(a)(5) and (1) of the National Labor Relations Act ("NLRA" or the "Act"), 29 U.S.C. § 158(a)(5) and (1), by refusing to bargain in good faith with the complainant labor unions, the Neoprene Craftsmen Union Local 788 ("NCU") and the Chemical Workers Association ("CWA") (collectively "Unions"). The NLRB, Respondent/Cross-Petitioner, also petitions for enforcement of its order finding that DDE violated the Act.

---

[*] The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

On appeal, DDE disputes the Board's finding that it is a "perfectly clear successor" and was therefore required to bargain with the Unions prior to establishing the initial terms and conditions of employment for its workforce. *See NLRB v. Burns Int'l Sec. Serv. Inc.*, 406 U.S. 272 (1972). For the following reasons, we affirm the NLRB's determination that DDE is a perfectly clear successor and that DDE violated the Act by not bargaining with the Unions prior to fixing the initial terms and conditions of employment.

## I. BACKGROUND

DDE is a joint venture between Dow Chemical Company ("Dow") and E.I. DuPont de Nemours Company ("DuPont") that produces synthetic rubber products. Considering itself a mere "successor" to DuPont, DDE offered employment to DuPont's workers and set the initial terms of employment without bargaining with the Unions.

The Unions have been the exclusive bargaining representatives for employees in DuPont's elastomer division for over 45 years. NCU represented 414 elastomer production and maintenance employees at DuPont's Louisville plant. NCU and DuPont's last contract was effective May 25, 1994 until March 21, 1996, and then from year-to-year until terminated by either party. CWA represented approximately 1,700 elastomer (synthetic rubber) production and maintenance employees and 150 clerical employees at DuPont's Chambers Works plant in New Jersey. CWA and DuPont's last contract was effective from July 18, 1991, until terminated by either party.

On January 31, 1995, while both labor contracts were effective, DuPont informed the Unions that it had signed a letter of intent to form a joint venture with Dow called DDE to produce and sell elastomer products. DuPont agreed to contribute its elastomer product line and its assets and equipment to DDE, and Dow agreed to contribute its patented "Insite" product technology to the joint venture.

It is essentially undisputed that DDE's management intended to hire DuPont's experienced elastomer employees. The joint venture's formation agreement states in pertinent part:

> Section 13.01. *Human Resources Philosophy.* Dow and DuPont recognize that the success of the Venture will depend largely on the quality of the employees that they will transfer to the Venture and the careful selection of persons to fill key positions. Dow and DuPont will endeavor to balance the selection of persons for key positions equally between Dow and DuPont employees, recognizing that these persons must have the capability to establish a new entrepreneurial culture for the Venture. The DD Elastomers management team shall be responsible for filling other management positions in DD Elastomers and the Venture.
>
> *Dow and DuPont anticipate that most of the personnel presently involved in the Dow Elastomer Business or the DuPont Elastomer Business will become employees of the Venture.*

(Emphasis added.) The formation agreement further provided that DuPont and Dow would "use their best efforts to cause such Elastomer Employees to accept such employment," and would offer them "compensation and benefits substantially equivalent" to their current compensation plans. At a meeting in January 1995, Don Johnson, the Louisville Plant Manager, told NCU officials that DDE wanted to hire all the Louisville elastomer employees and that DDE did not anticipate that any elastomer employees would lose their jobs.

On September 22, 1995, NCU officials wrote a letter requesting that DDE recognize NCU and honor the terms of the contract between DuPont and NCU. In the letter, NCU stated its understanding that DDE would conduct the same business operations, use the same assets under the same working conditions, and hire a majority of the same Louisville

record as a whole, we find sufficient evidence for a reasonable fact finder to reach the conclusions that the NLRB has reached. Therefore, this Court will not disturb those findings.

### III. CONCLUSION

Accordingly, we **AFFIRM** the decision of the NLRB. We also **ENFORCE** the order of the NLRB entered on October 31, 2000, in Case Nos. 9-CA-34028 and 9-CA-33536, finding that DDE violated the Act.

therefore, was bound to DuPont's labor contracts with the Unions.

As a general rule, no bargaining duty arises unless a union makes a valid bargaining demand upon the successor employer. *Fall River,* 482 U.S. at 52. However, as long as it is clear that a union wants to bargain on behalf of its members, "a demand to bargain collectively need assume no particular form." *NLRB v. Wayne Convalescent Ctr., Inc.,* 465 F.2d 1039, 1043 n. 7 (6th Cir.1972). Failure to "specifically demand bargaining is relevant, but not controlling." *Peters,* 153 F.3d at 299; *Wayne Convalescent Ctr.,* 465 F.2d at 1043 n. 7. A union may waive its right to bargain. For example, it may waive its right to bargain over a change in working conditions by failing to protest the change or request bargaining. *NLRB v. Henry Vogt Machine Co.,* 718 F.2d 802, 807 (6th Cir. 1983). But the waiver must be clear and unmistakable. *Metro. Edison Co. v. NLRB,* 460 U.S. 693, 708 (1983). Thus, an employer must show that the union received "clear and unequivocal notice" of a proposed change and that the union consciously relinquished its right to bargain. *Gratiot Cmty. Hosp. v. NLRB,* 51 F.3d 1255, 1260 (6th Cir. 1995), *YHA, Inc. v. NLRB,* 2 F.3d 168, 173 (6th Cir. 1993).

Here, the Unions wrote to DDE, stated that they considered DDE an alter ego of DuPont and demanded that DDE recognize them and bargain with them about the terms and conditions of employment. Although the Unions maintained their position that DDE was the alter ego of DDE, these letters reasonably informed DDE that the Unions wanted to discuss and bargain the terms and conditions of employment on behalf of their members. Instead of responding to the Unions' demand to bargain about the terms and conditions of employment, DDE narrowly answered that it was not the alter ego of DuPont and simply proceeded to set the initial terms and conditions of employment without bargaining. DDE's conduct indicated that it would not bargain the terms and conditions of employment with the Unions. Viewing this

employees. On October 18, 1995, Louisville Human Resources Manager Haven Harrington sent an e-mail to the elastomer employees at Louisville confirming that DDE would offer employment to all of them.

CWA also understood that DDE would hire DuPont employees. At a meeting on November 16, 1995, DDE informed CWA that it would hire all the DuPont employees working in the Viton and FMDL departments. That same day, CWA sent a letter asserting that DDE was the alter ego of DuPont and that DDE therefore had a continuing obligation to its employees. CWA further alleged that DDE was obliged to bargain with CWA for any changes to terms and conditions of employment before dealing with employees in the bargaining unit.

On November 21, 1995, DDE's designated President and CEO Donald Duncan issued a memorandum to elastomer employees at DuPont and Dow worldwide stating that DDE would announce its "general policy on compensation and benefits" by November 30, with details to follow in December, "leading up to the January 1, 1996 delivery of individual job offers which will include full details for each person."

On November 30, 1995, DDE issued a memorandum to all elastomer employees discussing compensation and benefits information. The memo indicated that DDE would adopt the current DuPont benefit plans, that local pay policies would continue to be applied, and that prior service at DuPont would be recognized for benefit purposes. The memo also stated that all employees at Chambers Works and all existing Elastomer Employees at Dow would receive offers, and indicating that "[i]t is the intent of DuPont and DuPont Dow Elastomers to minimize turnover and associated training." Disability benefits, the savings and investment plan, and vacation plan were to remain the same. Other benefits, such as the lifelong learning tuition refund, holidays, and home purchase assistance loans, were also to continue unchanged.

The memo further provided that:

DuPont Dow Elastomers most likely will be a "successor" of the two parent companies because its plans to offer jobs to current DuPont employees to establish its workforce.

If the venture hiring process results in more than 50% of the needed workforce coming from among employees represented by the Chambers Works union, the venture will meet its obligation and recognize the union.

*As a likely "successor company" the venture will set the initial terms and conditions of employment.* When appropriate, the venture will honor any duty to bargain.

(Emphasis added.) The memo also introduced a "Success Sharing" plan, which provided that every DDE employee would receive compensation equal to 8.3% (or one month salary) if DDE reached certain goals.

During the week of January 2, 1996, DDE offered employment directly to all DuPont elastomers employees working at Louisville and Chambers Works without bargaining with CWA or NCU. DDE advised DuPont employees that their current salary would remain unchanged and that they would be eligible for the success sharing program. The employees were required to respond within 30 days. Ninety-seven percent of the total number of employees offered employment accepted. Specifically, at Chambers Works, 98 employees accepted employment offers and 3 declined. At Louisville, 300 employees accepted and 9 declined.

On January 12, 1996, CWA filed an unfair labor practice charge against DDE, DuPont, and Dow. One week later, DDE announced changes to the terms and conditions at Chambers Works. DDE reduced the number of mechanical stovepipe job classifications from six to two, eliminated overtime pay for scheduled overtime not worked, and

employment conditions would remain the same. Moreover, the Company did not change the terms until after many of the employees had accepted job offers with DDE.

Under DDE's reading of *Peters*, the employer can have it both ways: it can lure experienced workers into accepting job offers by promising the same terms and conditions of employment, yet can reserve its ability to set the initial terms and conditions by simply announcing the changes post-hire, but "before or immediately after commencing operations." This interpretation cannot be reconciled with the *Burns* caveat or our holding in *Spitzer*.

To the extent that the second circumstance articulated in *Peters* conflicts with *Spitzer*, it cannot be the law of this Circuit. When a later decision of this court conflicts with the holding of a prior decision, it is the earlier case that controls. *Salmi v. Sec'y of Health & Human Servs.,* 774 F.2d 685, 689 (6th Cir. 1985) ("A panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Surpreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision."); *see* 6th Cir. R. 206(c) (stating that published panel opinions are binding on all subsequent panels). Because *Spitzer* was decided before *Peters* and no intervening authority from the Supreme Court or the Sixth Circuit sitting en banc requires a different result, *Spitzer* controls.

Therefore, we affirm the NLRB's determination that DDE was a perfectly clear successor and was consequently required to bargain with the Unions.

## B.  Waiver

DDE also claims that the NLRB improperly determined that the Unions did not waive their right to bargain over the terms and conditions of employment. DDE argues that the Unions waived their right when they refused to bargain, because they wrongly believed that DDE was the alter ego of DuPont and,

employee cannot set the initial terms of employment if "it is perfectly clear" that the company "intend[s] to rehire a sufficient number of employees to maintain the Union's majority status." *Spitzer*, 540 F.2d at 845.

In *Peters*, Samuel Peters announced that the contract was void on the very same day he was appointed receiver and during his initial contacts with the employees. Soon after commencing operations as *receiver*, Peters described the benefits package they could expect if he purchased Western's assets. Thus, Peters's statements indicating his intent to set new terms preceded his status as owner. In other words, while made "before or immediately afer commencing operations," Peters statements were made *in his capacity as court-appointed receiver* and not as owner.

By contrast, DDE's announcement of its new terms came long after initial negotiations and formal offers of employment had been made, and after 45% of the work force had accepted the offer on the basis of the original terms. That is, the Company clearly intended to hire a majority of the work force, and led the employees to believe that their

---

employees because it was fearful that it would not be able to exercise its right to set initial terms of employment, "a right to which the Supreme Court attaches great importance in *Burns*." *Spruce Up*, 1974 WL 4741, at *3.
*Id.* at 297-98.

We then held that an employer may set the initial terms of employment without first consulting the bargaining unit representatives if it has not by "tacit inference" misled the employees into thinking that the prior working conditions would continue, or if the employer has affirmatively announced new employment conditions "*before or immediately after commencing operations.*" *Id.* at 298 (emphasis added).

It is difficult to square the second circumstance with the *Spruce Up* and *REA Express* tests we relied on in *Peters*. Moreover, it is inconsistent with our concern that "[t]he proper test should afford a balance between the interests of successor employers and bargaining units" because it tips the balance in favor of the new employer at the expense of the bargaining unit. This is contrary to the *Burns* exception, and irreconcilable with our decision in *Spitzer*.

---

enhanced the severance program. It did not change the terms and conditions at Louisville. At the time DDE announced these changes, 45 percent of the Chambers Works employees had already accepted the unconditional offers of employment.

On January 25, 1996, NCU filed an unfair labor charge on behalf of the bargaining unit at the Louisville facility. The Board consolidated the charges. Subsequently, the General Counsel filed a complaint and amended complaint alleging that DDE and DuPont were "alter ego companies" or, in the alternative, that DDE was a "perfectly clear successor" to DuPont under *Burns*.

The ALJ dismissed the charges, finding that DDE was neither an alter ego of DuPont nor a perfectly clear successor. The ALJ's finding that DDE was not a perfectly clear successor was based on DDE's communication on November 30, 1995 that it intended to establish a success sharing plan. In the ALJ's view, this announcement put the employees on notice that the terms and conditions of employment would be different at DDE.

The General Counsel, CWA, and NCU filed exceptions to the ALJ's decision. The NLRB affirmed the ALJ's finding that DDE was not an alter ego of DuPont, but held that DDE was a perfectly clear successor to DuPont. It therefore held that DDE violated Section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1), by failing to recognize and bargain with the Unions, and by unilaterally setting initial terms and conditions of employment without bargaining with the Unions. The NLRB ordered DDE to cease and desist from the unlawful conduct, recognize and bargain with the Unions, rescind the unilateral changes if the Unions requested, make employees whole, and post a remedial notice.

## II. DISCUSSION

DDE raises two issues. First, DDE claims that it is not a perfectly clear successor because it announced new terms and conditions of employment before it began operations and did

not mislead its prospective workforce as to the terms and conditions of employment. Second, DDE claims that, even if it is a perfectly clear successor, the Unions waived their right to bargain with DDE by insisting that (1) DDE was the alter ego of DuPont, and (2) the labor contracts with DuPont were still effective.

### A. Perfectly Clear Successor

DDE argues that the NLRB improperly concluded that DDE was a perfectly clear successor obligated to bargain with the Unions before setting the initial terms and conditions of employment, because DDE announced new terms and conditions of employment before commencing operations and did not mislead its workforce.

This court reviews factual determinations of the NLRB under a "substantial evidence" standard. 29 U.S.C. § 160(e). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. Pentre Elec., Inc.,* 998 F.2d 363, 368 (6th Cir. 1993). That is, if the record viewed as a whole provides sufficient evidence for a reasonable fact finder to reach the conclusions the Board has reached, the court will not disturb those findings. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951). Conclusions of law are subject to a de novo review, although the court will uphold the Board's reasonable interpretation of the NLRA where Congress has not spoken to the contrary on the same issue. *"Automatic" Sprinkler Corp. of America v. NLRB,* 120 F.3d 612, 616 (6th Cir. 1997).

The obligation of a new employer to negotiate the initial terms and conditions of employment depends on whether the new employer is an ordinary successor or a "perfectly clear successor." It is a fundamental tenet of federal labor law that a new employer is generally free to set the initial terms of employment for the employees of a predecessor, without bargaining with the incumbent union. *Burns,* 496 U.S. at

to do so results in a test that is inconsistent with our prior holding in *Spitzer*.[1]  *Spitzer* clearly states that a successor

---

[1] *Peters* fails to cite *Spitzer*. In *Spitzer*, this Court noted that the Second Circuit, in defining the perfectly clear successor exception, relied on the NLRB's decision in *Spruce Up Corp.*, 209 NLRB No. 19 (1974).

The Second Circuit, relying on the Board's decision in *Spruce Up Corp.*, 209 N.L.R.B. No. 19 (1974), has considered the "perfectly clear" exception where the initial terms were announced prior to or simultaneously with the invitation to the predecessor's employees. *Brotherhood of Railway v. REA Express Inc.*, 523 F.2d 164, 171 (2d Cir. 1975). The court limited the exception to where the

> new employer has either actively or, by tacit inference, misled employees into believing they would all be retained without change in their wages, hours, or where the new employer, unlike the Respondent here, has failed to clearly announce its intent to establish a new set of conditions prior to inviting former employees to accept employment.

*Spitzer*, 540 F.2d at 845-46 (quoting *REA Express*). However, we did not at that time accept this reading of the *Burns* caveat:

> Without commenting on the acceptance of this limitation by this court, we believe the facts in the instant case are sufficient, nevertheless, to establish that the employees were misled by "tacit inference" into believing they would be retained without change in the conditions of employment. Here, the employees were told the Company would "carry on as usual."

*Id.* at 846.

In *Peters*, we discussed both the *Spruce Up* and *REA Express* tests for perfectly clear successor. *Peters*, 153 F.3d at 297. We then explained:

> The proper test should afford a balance between the interests of successor employers and bargaining units. Simply hiring the predecessor's union employees should not automatically trigger a duty to bargain. The successor employer should be given an opportunity either to set the initial terms of employment or to inform the employees that the conditions of employment would remain in place, subject to bargaining. By eliminating the successor employer's opportunity to set the initial terms of employment simply because it chooses to hire a substantial complement of its predecessor's employees may lead to dire consequences for such employees. For example, a successor employer may choose not to hire its predecessor's

employees only missed one day of work. To require anything more would result in lost work for the employees. When the employees learned of Peters's intentions to change the terms of their collective bargaining agreement, they could have chosen at that time to address the matter, and could have refused to work. They were not put in a worse situation as a result of Peters's actions. Accordingly, Peters was free to set the initial terms of employment, and the Board's conclusion to the contrary is in error.

*Peters,* 153 F.3d at 298.

In *Peters*, this Court emphasized the "unique circumstances" surrounding Peters's succession to Western, namely from court-appointed receiver to owner, and specifically found that as soon as Peters took control, but while still in his capacity as court-appointed receiver, he clearly informed the employees that he did not intend to honor the collective bargaining agreement were he to purchase the assets of the company. *Peters* is therefore distinguishable on its facts, because here DDE affirmatively represented for over a year that it wanted to employ union members on substantially the same terms as DuPont had employed them. In other words, unlike *Peters*, here there is substantial evidence that DDE directly and by "tacit inference" misled the union workers about its intentions. Thus, under the first circumstance articulated in *Peters*, DDE would not be allowed to unilaterally set the initial terms of employment.

But DDE hangs it hat on the second circumstance articulated in *Peters*. DDE claims that, because it announced a change in working conditions before commencing operations on April 1, 1996, under *Peters* it was entitled to unilaterally set the initial employment terms. Taken out of context, DDE's argument appears legitimate, since it did in fact announce the new terms at Chambers Works *"before or immediately after commencing operations."* However, this language cannot be divorced from the facts of the *Peters* case;

298-99. But where it is "perfectly clear" that the new employer intends to retain the unionized employees of its predecessor as a majority of its own work force under essentially the same terms as their former employment, then the new employer becomes a "perfectly clear successor" and must bargain with the union. *Id.* at 294-95; *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 41 (1987).

The Supreme Court first articulated the "perfectly clear successor" doctrine in *Burns, supra:*

Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms. In other situations, however, it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit as required by §§ 9(a) of the Act, 29 U.S.C. §§ 159(a).

*Burns,* 406 U.S. at 294-95 (dicta). The Court did not provide any guidance as to the scope of this exception, however.

Shortly after *Burns* was issued, we applied the *Burns* caveat in *Spitzer Akron, Inc. v. NLRB,* 540 F.2d 841 (6th Cir. 1976). We held that:

Under *Burns*, the successor employer can set the initial terms upon which rehiring is conditional provided that takes place before the duty to bargain arises. Generally, an otherwise successor can set the initial terms unilaterally without violating the Act since prior to the rehiring of his predecessor's employees, which constitute the majority of his work force in an appropriate unit,

there is no duty to bargain. . . . *The only instance in which the duty to bargain may precede the formal rehiring of employees is where "it is perfectly clear" the otherwise successor plans to retain a sufficient number of his predecessor's employees so that the union's majority status will continue.*

*Id.* at 844-45 (citations omitted) (emphasis added). In *Spitzer*, we found that the employer was a perfectly clear successor because the work force was hired prior to the announcement of changes in wages and benefits, and such modifications had not been part of the initial terms of rehiring by the successor. *Id.* at 843; 845. Moreover, the successor had also told the employees that he "'(wanted) every man to stay on the job, and would carry on as usual.'" *Id.* at 845.

In this case, DDE concedes that it is a successor employer to DuPont and Dow but denies that it is a perfectly clear successor. In finding to the contrary, the Board reasoned as follows:

> [I]t is certainly clear that DDE planned, and announced its intent, to retain the incumbent DuPont unit employees at Louisville and Chamber[s] Works. On November 15, 1995, DDE announced to the Unions that it intended to offer employment to all incumbent employees at both plants under terms and conditions to be announced on November 30.

> On November 30, DDE notified the Unions that, although it declined to honor their contracts with DuPont, DDE would maintain the employees' wages and benefits under those contracts, adding only the hiring incentive bonus of success sharing. DDE did not indicate that there would be any other changes in current terms and conditions of employment. In mid-December 1995, DDE held a series of meetings with incumbent employees at which it explained, in detail, the terms of its offer. Once again, there was no indication of changes in terms and

Thursday, Western Paper sent its employees home and informed them that it might not be able to cover their paychecks. On the following Monday, January 13, 1993, the Hamilton County, Ohio Court of Common Pleas appointed Peters to manage Western Paper's assets. Peters recalled Western Paper's employees the same day and told them that he would deliver paychecks for their prior work. Significantly, he also told them that the Union contract would be "'null and void during the receivership.'" *Peters*, 153 F.3d at 292. Soon after he became receiver, he addressed the employees and described the benefits package he would offer to them if and when he purchased Western's assets. *Id.*

UPW filed a series of unfair labor practice charges against Peters, alleging that he had violated § 8(a)(5) and (1) by unilaterally setting the initial terms and conditions of employment. The NLRB concluded that Peters was a successor to Western Paper and that he violated the Act by refusing to bargain with UPW. The Sixth Circuit reversed the NLRB's decision and held that Peters was free to set the initial terms of employment. In reaching this conclusion, the Court stated that:

> Peters clearly informed the employees that he did not intend to honor the collective bargaining agreement on January 13, 1992, the first day he assumed control of operations. The Board focused on the fact that the employees had arrived at work before Peters told them that he was not going to honor their collective bargaining agreement with Western [the predecessor employer]. The Board commented that Peters should have required the employees to fill out an application or otherwise ask the employees to be employed, at which time he could have informed them of his intent to change employment conditions. However, given the unique circumstances surrounding Peters's succession of Western, it was entirely reasonable for him to have the employees report to work so that he could inform them of his intentions. His actions resulted in a continuity of employment, as the

*Fall River*, 482 U.S. at 40-41; *Canteen Corp. v. NLRB*, 103 F.3d 1355, 1364-65 (7th Cir. 1997). Here, DDE, as a successor employer, was under no obligation to hire DuPont and Dow employees, but once it decided that it wanted an experienced work force, it became obligated to negotiate with those employees' representatives prior to setting the initial terms of employment.

Third, DDE further contends that it is not a perfectly clear successor because it announced new employment conditions before it began operations on April 1, 1996. In support of its position, DDE relies on *Peters v. NLRB,* 153 F.3d 289 (6th Cir. 1998), for its holding that:

> [T]he employer may set initial terms of employment without first consulting the bargaining unit representative under two circumstances. The employer may set initial terms (1) if it has not, by "tacit inference" misled the employees into believing that prior working conditions will remain stable, or (2) if it has affirmatively announced its intention to retain the employees under new employment conditions *before or immediately after commencing operations*. In any event, it would be wise for a successor employer to make its intentions known immediately and affirmatively.

*Peters,* 153 F.3d at 298 (emphasis added). DDE argues that because it announced new employment conditions before commencing operations it was permitted to set initial terms of employment without bargaining with the unions.

*Peters* involved a dispute between the United Paper Workers International Union, AFL-CIO Local 459 (UPW), and Samuel Peters, who was the court-appointed receiver of Western Paper Products, Inc. UPW had entered into a collective bargaining agreement with Western Paper that was to remain in effect through November 20, 1993. Western Paper was experiencing financial problems, however, and after its primary lender called in a loan on January 9, 1993, a

conditions of employment other than the addition of the success sharing plan. On or about January 2, 1996, DDE tendered unconditional offers of hire under the terms previously discussed.

In sum, up to and beyond the time of making formal offers of employment to all affected DuPont employees, DDE manifested a clear desire to retain all those employees under existing working conditions. It announced no new terms and conditions of employment other than the success sharing bonus plan. In fact, DDE *never* announced or implemented any other changes prior to beginning operations at Louisville. At Chambers Works, DDE waited until 17 days after it had formally tendered unconditional offers of hire before announcing significant changes. By that date, a number of Chamber [sic] Works employees had already accepted DDE's offer of employment.

. . . [I]t was perfectly clear no later than November 30 that DDE intended to retain its predecessor's employees at both Louisville and Chambers Works. Indeed, the success of the new joint venture depended on the continuing employment of this work force. The Respondent had announced its clear intent to hire the DuPont unit employees on November 15, while at the same time stating that it would disclose the terms and conditions of employment on November 30. On that later date, Respondent did not announce any new terms and conditions of employment other than success sharing, thus leading employees to believe that they would be employed on substantially the same basis as before. Further, there was nothing inherent in the announcement of success sharing by DDE on November 30, 1995, and conveyed in the offers of hire on January 2, which would diminish the likelihood that employees would accept DDE's offer of employment. To the contrary, if anything, the addition of success sharing--the only announced change--would have

enhanced, not diminished, the likelihood that employees would accept the offers. The subsequent announcement of changes at Chambers Works on January 19 were made after the formal hiring process had commenced and the obligation to bargain with the Unions about the initial terms and conditions of employment had already attached. . . . The Board has consistently found that an announcement of new terms will not justify a refusal to bargain if, as in this case, the employer has earlier expressed an intent to retain its predecessor's employees without indicating that employment is conditioned on acceptance of new terms.

*DuPont Dow Elastomers, L.L.C.*, 332 NLRB No. 98 (2000) (footnotes omitted).

Viewing the record as a whole, we find that the NLRB's factual findings are supported by substantial evidence and that its legal conclusions are permissible under the NLRA and controlling case law. Therefore, we will not disturb the NLRB's factual determinations or legal conclusions. Indeed, it is quite apparent that DDE wanted to retain DuPont's trained workers given its belief that "the success of the new joint venture depended on the continuing employment of this work force," and that it crafted its communications and negotiations with its predecessors' employees to ensure that DDE would not lose these experienced employees to other employers. The formation agreement between DuPont and Dow expressly contemplated that they would use "their best efforts" to hire DuPont's elastomer employees under substantially the same terms of employment. The November 30, 1995 announcement and January 2, 1996 offers maintained those terms and conditions of employment. In fact, as the Board found, other than the success sharing plan, *no* new terms or conditions were announced until well after unconditional employment offers had been made. DDE did not attempt to substantially alter the terms and conditions of employment until it had secured the same experienced work force. DDE's single statement in the November 30, 1995

memo that "[a]s a likely "successor" company, the venture will set the initial terms and conditions of employment" is not sufficiently clear and definite to overcome the impression carefully created by the Company that the terms and conditions would remain the same. Thus, under the *Burns* caveat and *Spitzer*, as the Board found, DDE is clearly a perfectly clear successor to DuPont and Dow and was therefore obligated to bargain with the Unions prior to setting the initial terms and conditions of employment.

DDE raises several challenges; we deal with each in turn. First, DDE claims that it did not hire the DuPont employees on substantially the same terms and conditions because its success sharing plan was a new condition of employment. We reject this argument. The success sharing plan, which consists of a 4% signing bonus and successive performance bonuses, was a hiring incentive designed to induce DuPont employees to accept employment with DDE. Thus, the success sharing plan helped to insure DDE's status as a perfectly clear successor.

Second, DDE maintains that affirming the NLRB's decision will ultimately disadvantage workers because employers will offer lesser employment terms simply to obtain the right to set initial terms and conditions of employment. This argument cuts two ways, however. If the new employer offers lesser or inconsistent terms and ignores the union, it runs the risk of losing the experienced work force to other employers. Thus, as the Supreme Court observed in *Fall River*:

> [T]o a substantial extent the applicability of *Burns* rests in the hands of the successor. If the new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor, then the bargaining obligation of § 8(a)(5) is activated. This makes sense when one considers that the employer *intends* to take advantage of the trained work force of its predecessor.